## THE BOARD OF COMMISSIONERS OF JEFFERSON COUNTY v. F. M. JOHNSON.

1. TAXATION; *Description of Land, Sufficient.* A certain piece of land was assessed and taxed for several years under the following description, to wit: " The S. W. ¼ survey 18, 170 acres, K. H. B. I. L., Jefferson county, Kansas." This description written out in full means as follows: The southwest quarter of survey 18, containing 170 acres of the Kaw or Kansas half-breed Indian lands, situated in Jefferson county, Kansas. There was a piece of land in Jefferson county, containing about $682\frac{45}{100}$ acres, known on the survey plats of the United States as "survey eighteen of the Kansas half-breed lands." This piece of land was subdivided, prior to its being taxed, by the county surveyor, who made the southwest division thereof to contain about 170 acres. The owner of the land generally paid the taxes thereon, but for the years 1873 and 1874 did not do so, and the present plaintiff purchased the land at a tax sale for such taxes, and obtained a tax deed for such land. The plaintiff, however, afterward came to the conclusion that said description of the land was void, and therefore that his tax title was void, and

he therefore commenced this action under the statute (§ 146 of the tax law) against the board of county commissioners, to recover the money which he had previously paid in procuring said tax title. *Held,* That under the circumstances of this case, said description is not void, nor is it voidable to the extent that it can be declared void in this action.

2. IRREGULARITY IN TAX LEVY; *Tax Sale, Not Void.* In 1873 the county commissioners of Jefferson county, in levying the various taxes on the taxable property of said county, did not in every instance, and for each particular tax, state in their record that they levied a certain number of mills *on the dollar*, but merely stated that they levied such number of mills, omitting the words "on the dollar." But their intention was easily understood. The taxes were all made out properly and placed upon the tax roll, as usual, and collected in the ordinary way, and no questions were raised. *Held,* That the failure on the part of the county board to make their levy more definite was a mere irregularity, and that it did not render the tax sale or any of the other tax proceedings absolutely void.

3. ———— *Certified Tax Roll.* Also, *held,* that the failure of the county clerk to attach his certificate to the said tax roll of 1873 is a mere irregularity, and that neither the tax roll nor the subsequent proceedings can now be held void merely because of such failure.

### *Error from Jefferson District Court.*

ACTION brought by *Johnson* against the *Board of Comm'rs of Jefferson Co.*, to recover for money by him paid upon a certain tax sale which he claimed to be invalid. The opinion contains a sufficient statement of the facts. Trial at the June Term, 1878, of the district court, and judgment for the plaintiff. The defendant brings the case here.

*Peck, Ryan & Johnson,* and *W. F. Gilluly,* for plaintiff in error.

*Keeler & Gephart,* for defendant in error.

The opinion of the court was delivered by

VALENTINE, J.: This was an action brought by F. M. Johnson against the board of county commissioners of Jefferson county, to recover for money paid by him upon a certain tax sale claimed by him to be invalid. This sale was consummated on May 6, 1874, for the taxes of 1873. The plaintiff (defendant in error) claims that this sale was void, for the following reasons:

"1. There was no sufficient description of the land sold.

"2. The sale was for many times the amount of the taxes levied.

"3. No certified tax roll of 1873 was ever delivered to the county treasurer."

We shall consider these reasons in the above order.

I. The description under which said land was taxed and sold was as follows: "The S.W. $\frac{1}{4}$ survey 18, 170 acres, K. H. B. I. L., Jefferson county, Kansas." This description written out in full means as follows: The southwest quarter of survey 18, containing 170 acres, of the Kaw or Kansas half-breed Indian lands, situated in Jefferson county, Kansas. It appears from the facts admitted and proved in this case, that there was and is a piece of land containing about $682\frac{45}{100}$ acres, situated in said Jefferson county, designated on the official survey plats of the United States as "survey eighteen (18) of the Kansas half-breed lands;" that this land was never divided or subdivided by authority of the United States into quarter-sections or otherwise, but that in 1867 the county surveyor of Jefferson county divided and subdivided it, making the southwest division thereof to contain about one-fourth of the entire tract, or about 170 acres. And it also appears that this survey or division and subdivision of the tract made by the county surveyor was properly recorded in the county surveyor's registry of Jefferson county, as provided by law; (Gen. Stat., pp. 289, 290;) that at this time said southwest subdivision was owned and occupied by Philip Bowers; that from that time hitherto said southwest subdivision has been assessed and taxed and known to the county officers of Jefferson county by the description under which it was sold to the plaintiff; that said Bowers paid the taxes on said land as so assessed and taxed from 1867 up to 1871; that about 1871 or 1872 G. R. Hines became the owner of the land (said subdivision) by virtue of a sheriff's deed and a deed of conveyance from Bowers to himself; that the land was afterward sold for the taxes of 1872; that Hines became the purchaser of the tax-sale certificate, and afterward procured a tax deed

thereon, in which tax-sale certificate and tax deed the land was described as "the southwest quarter of survey eighteen (18) of the Kansas half-breed lands;" that on May 6, 1874, the land was again sold for taxes—this time for the taxes of 1873—and the plaintiff was the purchaser as aforesaid, paying therefor $110.78; that on December 21, 1874, the plaintiff paid the taxes on said land for the year 1874, and had the amount thereof, which was $124.81, indorsed on his tax-sale certificate; that about the 9th of January, 1878, the plaintiff supposed that he had discovered that "said tax sale was invalid, and asked the county clerk to indorse on said certificate a refusal to make a tax deed thereon;" that the clerk probably did not make any such indorsement, but why he did not, is not shown; that on April 9, 1878, the plaintiff delivered said tax-sale certificate to the clerk, who executed a tax deed to him thereon; that on the same day the plaintiff presented his claim to the board of county commissioners for the sum of $321.35, for said taxes paid by him, and interest thereon and costs, claiming that the whole of the tax proceedings with reference to said land were void. The commissioners rejected his claim, and then he appealed to the district court, where his claim was allowed, and then the commissioners brought the case to this court for review.

The facts admitted and proved also show that there was no other land in Jefferson county that would answer to the description by which this land was assessed, taxed, sold and conveyed, and this land was not assessed or taxed by any other description. The description used by Bowers and Hines in giving and receiving deeds, except said tax deed executed to Hines, was different from the description used in said tax proceedings, being by metes and bounds. With reference to descriptions of lands used in tax proceedings, we would refer to the following statutes: Gen. Stat. of 1868, p. 1049, § 93; Comp. Laws of 1879, pp. 962, 970, §§ 119, 153. Said sections 93 and 119 read as follows:

"It shall be sufficient to describe lands in all proceedings relative to assessing, advertising or selling the same for taxes,

by initial letters, abbreviations and figures, to designate the township, range, section, or parts of section, and also the number of lots and blocks."

Said section 153 reads as follows:

"In all advertisements, certificates, papers or proceedings relating to the assessment and collection of taxes and proceedings founded thereon, any description of lands which shall indicate the land intended with ordinary and reasonable certainty, and which would be sufficient between grantor and grantee in an ordinary conveyance, shall be sufficient."

With reference to irregularities, we would cite the following statute:

"No irregularity in the assessment roll, nor omission from the same, nor mere irregularities of any kind in any of the proceedings, shall invalidate any such proceeding, or the title conveyed by the tax deed; nor shall any failure of any officer or officers to perform the duties assigned him or them upon the day specified work an invalidation of any such proceedings, or of said deed." (Gen. Stat. of 1868, p. 1057, § 113; Comp. Laws of 1879, p. 967, § 139.)

For decisions with reference to the sufficiency and insufficiency of descriptions in general of land, see cases cited by Mr. Hilliard in 2 Hill. on Real Prop., ch. 88, pp. 517 to 549, §§ 51 to 115. Also see 4 U. S. Dig. (F. S.), pp. 529 to 544, ¶¶ 1437 to 1751.

The objections urged against the description in the present case are as follows: It would be difficult to ascertain the exact boundaries of the southwest quarter of said survey 18, as such boundaries have never been established except by the county surveyor of Jefferson county, and as said survey is of a trapezoidal form, bounded on the south side by the Kansas river, with its east-and-west boundary lines of unequal lengths, containing more than four times 170 acres of land, and the land in question being designated in said description by initial letters only.

Now under all the authorities, descriptions may be made in any form or in any manner which the parties may choose, provided such descriptions are not so uncertain or indefinite as to render it impossible to ascertain where the land lies.

46—23 KAS.

If such descriptions are sufficiently definite to designate the land by the aid of surrounding circumstances, or if they can be made sufficiently definite by the aid of matters or things had in contemplation by the parties, then such descriptions will be held to be sufficient and valid, although they might be considered slightly defective if viewed by themselves alone or without the aid of auxiliary circumstances. Indeed, descriptions are never absolutely perfect in and of themselves. They always need the aid of something outside of their own expressed terms. If a description refers to a section corner, the location of this section corner must always be ascertained from something wholly independent of the description itself. It must be ascertained from field notes, from plats, from surveys, and from the recollection of witnesses. If the description refers to a section line, then the location of this section line must be ascertained in the same manner, or if it refers to a quarter-section, then the boundaries of this quarter-section must be ascertained by the same processes; and in ascertaining these boundaries, there is always room for differences of opinion, for disputes and litigation. Quarter-sections are generally supposed to be square, and to be exact fourths of the sections of which they form a part; but while this supposition approaches truth, it is scarcely ever correct. Quarter-sections are seldom, if ever, squares. Nor are they rectangles, or parallelograms, or even trapezoids; but in nearly all cases they are pure and simple trapeziums, and sections are equally as bad. They are usually bounded by section corners, unequally distant from each other, and four quarter-section corners not on a line with the section corners, and four broken lines of unequal lengths passing through these corners, with no portions of such lines parallel, and none of the angles right angles, and each section containing four quarters of unequal size, and such as we have heretofore described. Of course, the government intends that each section shall be a square, containing 640 acres of land; and while sections in fact closely approach these ideal sections in form and size, yet they never in fact reach to such perfection. The quarter-

section corner in the middle of the section is seldom, if ever, established by the government, and the other corners are often so obliterated that no person could tell where they originally stood. Yet, with all these irregularities and uncertainties incident to government surveys, government corners and government lines, there can be but little difficulty in making good and valid descriptions founded upon ·such surveys. "The N.W.$\frac{1}{4}$ of the S.E.$\frac{1}{4}$ of the N.W.$\frac{1}{4}$" of a certain section of land would be a valid description of a piece of land in such section, although such piece of land would not touch a government corner nor a government line, and no one could tell, without a survey, its exact location or its exact form or size. It would contain about ten acres of land in nearly a square form.

We do not think that the description in the present case is void ; and whether it is voidable, or not, we do not think that it is necessary now to decide. It contains but few more of the elements of uncertainty than descriptions usually do; and these elements of uncertainty are but slightly greater than such elements usually are. Certainly, none of the persons interested in knowing what this description . meant had any right to be misled it; and it can scarcely be possible that any person was misled by it. Hines owned the land, and knew that it was taxable ; he knew that it had previously been taxed by this description; and he ought to have known that it was so taxed at this time. At this time, it was taxed by this description, and was not taxed by any other description. Hines ought to have known this ; he knew whether he paid his taxes or not; he ought to have paid them, but he did not do so, and his land was sold for such taxes. And it was sold by said description, and Johnson bought it, and afterward a tax deed was issued thereon to him. Now if the county is bound to pay these taxes back to Johnson, then Hines will probably be wholly relieved from paying the same, and the county will probably have to lose them. This would not be just. But if, on the other hand, the county does not pay these taxes, then Hines may have to pay them, or lose his

land; and it would be right that he should do the one or the other. And while there is a prospect for Johnson to get his money or the land from Hines, he should not recover the money from the county. The description and the tax deed founded thereon not being void, but being at most only voidable, if Johnson should put his tax deed on record, and then occupy the land for the period of time prescribed for the limitation of actions in tax-title cases, he would get a good title to the land. He now has at least an inchoate title, which may in time ripen into a perfect title; and if it should ripen into a perfect title, then he will have the land, and the county will have the taxes. And if Hines makes no objections to the forthcoming of such an event, Johnson should not; but if Hines should object (and whether he will or not does not yet appear), still the county may be able to retain the taxes. Certainly it will if no action is brought by any person; and it will if Hines should bring the action and fail. And even if Hines should bring the action and succeed, if the action were for the recovery of the land, or to set aside any of the tax proceedings, the county would still retain the taxes, for before Hines could obtain any relief he would have to pay to Johnson the full amount of the taxes paid by Johnson, with interest, and the county would still retain the taxes paid to it. If, however, Johnson should commence the action, and should fail because the sale was invalid, then the county would be liable to pay back the taxes, under § 146 of the tax law. (Comp. Laws 1879, pp. 968, 969.) And that would be soon enough for the county to pay them. As the tax deed is not void, but at most only voidable, we think that Johnson should first exhaust all his remedies to make his tax deed available before asking the county commissioners to refund any of the money paid by him for his tax title. A purchaser of tax titles should treat the county (which is substantially his grantor) with the utmost good faith, and should try to get either the land or the taxes from the person who ought to pay the taxes, before he comes back to the county asking for a repayment of the same. Of course, if the sale

was clearly and absolutely void, he would not be required to take all this trouble. But in this case, as we have already stated, the sale is not clearly and absolutely void, but at most only voidable. Johnson however claims that the sale was void for two other reasons, but as we do not think that the sale was void for these two reasons any more than for the reason of an indefinite description of the land, and at most was only voidable, all that we have said with reference to void and voidable sales, while discussing said indefinite description, will apply to these other two reasons. We shall now consider these other two reasons.

II. The claim that "the sale was for many times the amount of taxes levied" is founded upon the fact that the board of county commissioners, in levying the various taxes for the year 1873, on the taxable property of Jefferson county, did not, in every instance, and for each particular tax, state in their record that they levied a certain number of mills *on the dollar*, but merely stated that they levied such number of mills, omitting the words "on the dollar." But no one seems to have been misled as to what the county commissioners meant, and we do not think that any person familiar with county business could have been misled as to what they meant. None of the county officers were misled. The county clerk calculated the taxes correctly, and placed them upon the tax roll as usual, and they were collected in the ordinary way. In the present case the land was sold for just the amount of the taxes placed upon the tax roll, and the amount appearing to be due against the land, with interest, penalty and cost. It does not appear that any question has ever before been raised with regard to said levy. We think the failure on the part of the county board to make the levy more definite was a mere irregularity, and that it did not render the tax sale or any of the other tax proceedings absolutely void.

III. Neither was the failure of the county clerk to attach his certificate to the tax roll of 1873 anything more than a mere irregularity; and we cannot now, at this late day and

after the tax roll has been considered valid for several years, hold that it and all the subsequent tax proceedings for that year are void, merely because of such failure. If these questions had been raised earlier, or if they were now to be considered as between the original owner of the land and the tax-title purchaser, and the original owner of the land was desirous of paying his taxes and redeeming his land, and the tax-title purchaser was resisting the same, we should be much more inclined to consider said irregularities as of a serious nature and of far greater importance than we now do under the circumstances of this case.

The judgment of the court below will be reversed, and cause remanded for a new trial.

All the Justices concurring.